**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**CHRISTOPHER LANCASTER,**

      **Plaintiff,**

**v.**                                         **Civil Action No. 1:16cv200**
                                                        **(Judge Keeley)**

**J. TODD, Officer; OFFICER ARTRIP;**
**C. O. B. KUNKLE; OFFICER FERRELL;**
**M. DOYLE, Lieutenant; NURSE MYERS;**
**NURSE FOWLER; NURSE HILEMAN;**
**LT. HARRISON; TERRY O'BRIEN, Warden;**
**ODOM, Assoc. Warden; THOMPSON,**
**Executive Ass't.; NURSE DAWSON;**
**CAP'T. GILLY; D. JONES, Counselor;**
**SHERK, Officer; C. TROOPMAN, Officer;**
**C. BENNET, Officer; B. MICHAELS [sic],**
**Officer; MERKERGO [sic]; BRADLY,**
**Officer; ALLISON, Officer; ANDREWS,**
**Officer; BOYARD, Officer; and "all**
**unknown not listed in Complaint,"**

      **Defendants.**

## REPORT AND RECOMMENDATION

On October 21, 2016, the *pro se* Plaintiff, an inmate then-incarcerated at USP Florence

High[1] in Florence, Colorado, initiated this case by filing a <u>Bivens</u>[2] civil rights complaint against

the above-named defendants.[3] ECF No. 1. Along with his complaint, he filed a motion to

---

[1] Plaintiff is presently incarcerated at USP Coleman II in Coleman, Florida.

[2] <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).

[3] On March 22, 2016, seven months before filing this case, Plaintiff filed a Federal Tort Claim Act ("FTCA") complaint over the same June 5, 2014 incident and injuries claims he raises here. See <u>Lancaster v. United States</u>, Case No. 3:16cv30. On May 18, 2017, Magistrate Judge Robert Trumble entered a Report and Recommendation ("R&R"), recommending that the Defendant's dispositive motion be granted and that Plaintiff's complaint be dismissed. See <u>id.</u> at ECF No. 72. On August 11, 2017, Chief District Judge Gina Groh entered a Memorandum Opinion and Order adopting in part that R&R, granting the United States' motion for summary judgment, and dismissing the Plaintiff's FTCA complaint with prejudice as to his claims of assault and battery and dismissing without prejudice his medical negligence claims. See <u>id.</u> at ECF No. 85.

1

proceed as a pauper with supporting documents. ECF Nos. 2, 3, & 4. Plaintiff was granted permission to proceed as a pauper on October 24, 2016; his initial partial filing fee was waived but he was assessed the entire filing fee. ECF No. 5.

Thereafter, on October 26, 2016, the undersigned conducted a preliminary review of the complaint and entered an Order directing the Clerk to issue a sixty-day summons to each individual Defendant and to have the United States Marshal Service effect service on each individual Defendant. ECF No. 6. Plaintiff was also given an additional thirty days in which to identify the John and/or Jane Doe defendants. Id. at 2. On December 9, 2016, the Defendants moved for an extension of time in which to answer. ECF No. 12. By Order entered December 12, 2016, the motion was granted. ECF No. 13.

On January 24, 2017, the summonses were returned executed for all Defendants except for Defendant Todd. See ECF No. 18.

On January 29, 2017, the Defendants moved for a second extension of time. ECF No. 27. By Order entered February 1, 2017, the motion was granted. ECF No. 28. On February 22, 2017, Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment with a Memorandum in Support. ECF No. 32. Because Plaintiff is proceeding *pro se*, the undersigned issued a notice pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975), advising Plaintiff of his right to file a response to the Defendants' dispositive motion. ECF No. 33. On March 9, 2017, Plaintiff moved for an extension of time to respond. ECF No. 34.

On March 13, 2017, Plaintiff filed a Motion for Discovery; a Motion for Appointed Counsel; a Motion for an Injunction to Write to Witnesses in Other Prisons; a letter motion to amend the complaint; and a Motion for an Injunction to be Seen by an Outside Specialist. ECF

Nos. 36, 37, 38, 39, & 40. By Order entered March 15, 2017, Plaintiff's motion for appointed counsel was denied. ECF No. 41.

On May 1, 2017, Plaintiff filed a Motion for Leave to File an Amended Complaint. Defendants filed a response in opposition on May 11, 2017. ECF No. 44.

On May 15, 2017, without leave of court, Plaintiff filed fourteen separate documents in response to Defendants' dispositive motion, thirteen of which were titled variously as responses in opposition or "declarations" in opposition, "genuine issue of material facts," "statement of facts (or) genuine issue of material facts," a "Supplemental Complaint (or) Supplemental Motion, totaling 34 pages. ECF Nos. 45 – 57. The fourteenth document was 94 pages of exhibits in support of all of the responses, at least 50 pages of which were copies of Plaintiff's self-created, handwritten "cop outs" regarding his own account of the June 5, 2014 events, descriptions of his alleged injuries and attempts to exhaust his administrative remedies. ECF No. 58. By Order entered May 16, 2017, Plaintiff's March 9, 2017 motion for an extension of time was granted *nunc pro tunc*, but except for the 94 pages of exhibits, his May 15, 2017 response was stricken from the record for exceeding the page limits prescribed by the Local Rules of Prisoner Litigation Procedure ("LR PL P"), and Plaintiff was directed to refile his response in accordance with the rules within twenty-one days. ECF No. 59.

On May 26, 2017, Plaintiff filed a Motion to Supplement or Supplemental Complaint, which was construed as another motion to amend and docketed accordingly. ECF No. 60. On June 5, 2017, Plaintiff filed another motion for an extension of time, seeking a 60-day extension. ECF No. 62. By Order entered June 13, 2017, Plaintiff's motion was granted in part and he was given until July 31, 2017 to file his response. ECF No. 63.

On June 14, 2017, the undersigned entered a Report and Recommendation ("R&R"), recommending that Plaintiff's three motions for leave to amend the complaint be denied as futile. ECF No. 64. By Order entered July 10, 2017, the R&R was adopted. ECF No. 67.

On July 13, 2017, Plaintiff filed a response in opposition to the Defendants' dispositive motion, along with a Motion to Postpone Summary Judgment. ECF Nos. 69 & 68.

On August 3, 2017, again without leave of court, and in direct contravention of the May 16, 2017 Order that struck his previous response for its failure to comply with the LR PL P, Plaintiff filed a second response to the Defendants' dispositive motion, comprised of seven separate documents, which, along with his July 13, 2017 motion and response in opposition totaled 32 pages, titled variously as: "Genuine Issue of Material Facts" [ECF No. 71]; "Declaration in Opposition to Defendants' Genuine Issue of Material Facts" [ECF No. 72]; "Attachment Z1-2, 'There are Genuine Issue of Material Facts that Preclude Summary Judgment for the Defendants on the Plaintiff Use of Force Policy [sic]' [ECF No. 73]" "Genuine Issue of Material Facts" [ECF No. 74]; "Declaration in Opposition of Defendants Undisputed Facts" ECF No. 75]; "Genuine issue of Disputed Facts to Defendants" [ECF No. 76]; and "Declaration of Facts in Opposition to Defendants' Motion for Summary Judgment} ECF No. 77; with a certificate of service for all. ECF No. 78.

Accordingly, this case is now before the undersigned for review, report and recommendation pursuant to LR PL P 2.

## I. Contentions of the Parties

### A.  The Complaint

In the complaint, the Plaintiff raises claims of retaliation, racial animus, excessive force; and deliberate indifference to serious medical needs claims arising out of an incident or incidents

that occurred on or about June 5 - 6, 2014, while he was incarcerated at USP Hazelton. ECF No. 1 at 11 – 16.

Specifically, Plaintiff alleges that while being escorted to his cell with his hands cuffed behind his back, the Correctional Officers ("COs") cursed at and used racial slurs against him and then Officer Artrip pushed him, deliberately smashing his face into the wall. Id. at 13. Plaintiff maintains that the resulting impact chipped four of his front teeth, knocked one tooth out, split his head open in a two-inch gash, causing a "slight concussion" and making him lose consciousness. Id. It also appears that Plaintiff alleges that afterwards, he was "slammed to the floor" in his cell, thereby injuring his lower back. Id. at 14. Plaintiff next contends that he was denied medical care after this incident, per orders of Lieutenant Doyle [id. at 13] and that staff "falsified a document stating I attempted to kick staff" and that video footage will disprove this. Id. at 16.

Plaintiff contends that as a result of the attacks, in addition to the four "shattered" teeth, one of which later fell out, he now has low back pain; headaches, dizziness, blurred vision; depression; possible post-traumatic stress disorder ("PTSD"); mood swings; difficulty sleeping; and anal bleeding. Id. at 14.

The Plaintiff both states that he has and has not exhausted his administrative remedies with regard to his claims because "the administrative process was denied" to him. Id. at 4.

As relief, Plaintiff requests $555,555.55 in monetary damages. Further, he seeks injunctive relief in the form of the firing of "all staff involved in cover up[;]" the assignment of a "Phych [sic]" for the treatment of his mood swings, depression, sleep disorder, and PTSD, and a referral to a "back & head specialists" for treatment of his injuries. Id.

**B. Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment**

The Defendants contend that the Plaintiff's complaint should be dismissed or summary judgment should be granted in their favor, because

1) Plaintiff has failed to exhaust his administrative remedies [ECF No. 32-1 at 7];

2) Defendants O'Brien, Ferrell, Gilley and Hileman must be dismissed because they had no personal involvement in the events at issue [id. at 8];

3) Defendant Meyer is immune from liability because he is a Public Health Service employee and must be dismissed from this action [id. at 9];

4) the remaining Defendants are entitled to qualified immunity [id. at 10];

5) Plaintiff's claim of excessive force should be dismissed because the Defendants used reasonable force under the circumstances [id. at 12]; and

6) Defendants were not deliberately indifferent to Plaintiff's medical condition; Plaintiff received reasonable, timely, and appropriate medical care at all times. Id. at 15.

## C. **Plaintiff's Response**

In his July 13, 2017 Motion to Postpone Summary Judgment, Plaintiff requests that the Court postpone a decision on summary judgment until the Assistant United States Attorney ("AUSA") produces a copy of the June 5, 2014 video footage taken on Tier 1 near Cell 115 and off Tier 1, behind the officers station, including all footage of Defendants' movements from the time of the initial assault until Plaintiff was returned to Cell 115, including footage of a medical assessment. ECF No. 68.

In his response in opposition to Defendants' dispositive motion, filed along with his motion to postpone, Plaintiff reiterates his claims and arguments and attempts to refute some of the Defendants' arguments on the same. ECF No. 69 at 1 – 11. Plaintiff's response does not address Defendants' contentions that Meyer, as a Public Health employee, is immune from liability: that Defendants O'Brien, Ferrrell, Gilley, and Hileman should be dismissed from this

action because they had no personal involvement in the events: or that he failed to exhaust his administrative remedies.

In Plaintiff's second, seven-document response, filed on August 3, 2017, he again reiterates his claims and arguments, and again attempts to refute Defendants' arguments on the same. For the first time, he addresses and attempts to refute Defendants' arguments that Meyer, as a Public Health employee, is immune from liability: that Defendants O'Brien, Ferrrell, Gilley, and Hileman should be dismissed from this action because they had no personal involvement: or that he failed to exhaust his administrative remedies. ECF No. 76. In yet another document, Plaintiff again repeats his claims and arguments opposing dismissal of his complaint for failure to exhaust, Defendants' qualified immunity, and Defendant Meyer's particular immunity as a Public Health Employee, and for the first time, alleges that Defendants committed intentional acts: assault, battery, medical negligence, and alleges that they created a "cover up" of their medical negligence via the "use of force policy." ECF No. 77 at 1 – 2.

## II. <u>Standard of Review</u>

### A. <u>Motion to Dismiss</u>

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs., Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993); <u>see</u> <u>also</u> <u>Martin</u>, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir. 2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court, which has held that a "claim has factual plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

**B. Motion for Summary Judgment**

A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Motions for summary judgment impose a difficult standard on the moving party because it must be obvious that no rational trier of fact could find for the nonmoving party. <u>Miller v. Fed. Deposit Ins. Corp.</u>, 906 F.2d 972, 974 (4th Cir. 1990). In applying the standard for summary judgment, a court must review all evidence "in the light most favorable to the nonmoving party." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Celotex</u>, the Supreme Court held that the moving party bears the initial burden of informing the court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex</u>, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Electric Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. <u>Id</u>. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . .must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." <u>Id.</u> "If the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. <u>Anderson</u>, 477 U.S. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

### III. <u>Analysis</u>

#### A. <u>Warden Terry O'Brien and Captain Gilly</u>

Liability in a <u>Bivens</u> case is "personal, based upon each defendant's own constitutional violations." <u>Truloch v. Freeh</u>, 2755 F.2d 391, 402 (4th Cir. 2001) (internal citation omitted). Thus, in order to establish liability in a <u>Bivens</u> case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. <u>See Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994); <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 666 (3rd Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown.[4] <u>See Zatler v. Wainbright</u>, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for violation of a constitutional right in a <u>Bivens</u> case. <u>Rizzo v. Good</u>, 423 U.S. 362 (1976).

Here, Plaintiff does not allege any personal involvement on the part of Warden O'Brien or Captain Gilly. In fact, beyond naming O'Brien and Gilly as Defendants, he never mentions them in the body of his complaint. Accordingly, Plaintiff appears to name O'Brien only in his official capacity as the Warden of USP Hazelton, and Gilly, in his official capacity as a Captain. However, a suit against government agents acting in their official capacities is considered a suit against the United States itself. <u>See Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985) ("Official-

---

[4] To the extent Plaintiff may be asserting that O'Brien and/or Gilly violated his constitutional rights by denying his administrative grievance, that claim is without merit. This is not the type of personal involvement required to state a § 1983 claim. <u>See Paige v. Kupec</u>, 2003 WL 23274357 *1 (D. Md. March 31, 2003).

capacity suits . . . 'generally present only another way of pleading an action against an entity of which an officer is an agent.'"). Thus, remedy under <u>Bivens</u> is not available against O'Brien in his official capacity, and he should be dismissed with prejudice as a defendant in this action.

## B. FTCA's Judgment Bar

As noted *supra*, Plaintiff previously brought his claims regarding the June 5, 2014 incident and the subsequent denial of medical care in a FTCA action, as Case No. 3:16cv30. In that action, his <u>Bivens</u> constitutional claims of excessive force and deliberate indifference to serious medical needs were raised as assault and battery and medical negligence claims. On August 11, 2017, the assault and battery claims were dismissed with prejudice pursuant to the FTCA's discretionary function exception, and the medical negligence claims were dismissed without prejudice.

As a general rule, an FTCA action is the exclusive civil remedy available against government employees acting within the scope of their employment. The FTCA's provisions are contained in two areas of the United States Code. One, 28 U.S.C. § 1346(b), gives federal district courts exclusive jurisdiction over tort claims against the United States for the acts of its employees subject to the provisions of Chapter 171 of Title 28. Chapter 171, in turn, is labeled "Tort Claims Procedure" and comprises the remaining provisions of the FTCA. 28 U.S.C. §§ 2671 – 2680. Twenty-eight U.S.C. § 2680 details certain categories of claims to which are exceptions to the FTCA's applicability; among them is 28 USC § 2680 (a): any claim that arises from an employee of the Government's act or omission during the performance of a discretionary function.

There is also an exception to the FTCA for claims of constitutional violations. <u>Brodnik v. Lanham</u>, No. CV 1:11-0178, 2016 WL 4087361, at *3 (S.D.W. Va. Aug. 1, 2016) (internal

citations omitted). Accordingly, a prospective plaintiff seeking redress against a federal official for injury has two distinct avenues of relief: he may file a common law tort claim against the United States under the FTCA and—or in the alternative— he may file a constitutional tort claim against the individual officer under Bivens. A plaintiff may also decide to proceed under both theories, as Plaintiff did here, and may bring both an FTCA claim and Bivens claim against the individual defendants.   When the claims are brought together, courts often bifurcate the proceedings to address the FTCA claim first. Id.

When deciding whether to pursue a claim under the FTCA or under Bivens, or both, a plaintiff must consider the distinct advantages and drawbacks of the two causes of action. One of those drawbacks is that a judgment under the FTCA constitutes "a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim." 28 U.S.C. § 2676. This is referred to as the FTCA "judgment bar."   Under the judgment bar, a plaintiff who elects to pursue a remedy under the FTCA to judgment risks dismissal of his/her Bivens claim if the Bivens claim arises from "the same subject matter" and is against the same "employee whose act or omission gave rise to the claim." Id. This is true whether the FTCA claim is brought before or after the Bivens claim, or if both claims are brought in the same suit. It is also true irrespective of whether the FTCA judgment is favorable to the plaintiff or the United States. *Compare*  Unus v. Kane, 565 F.3d 103, 121 – 22 (4th Cir. 2009) (same suit, FTCA judgment for United States) *with* Rodriguez v. Handy, 873 F.2d 814, 816 (5th Cir. 1989)(same suit, FTCA judgment for plaintiffs); see also Moon v. Price, 213 F.2d 794, 796 (5th Cir. 1954)(different suits, FTCA judgment for plaintiff); Harris v. United States, 422 F.3d 322, 333 – 35 (6th Cir. 2005) (same lawsuit, FTCA judgment for United States); Serra v. Pichardo, 786 F.2d 237, 238 (6th Cir. 1986); Williams v. Fleming,

597 F.3d 820, 821 (7th Cir. 2010)(same suit, FTCA judgment for United States); Manning v. United States, 546 F.3d 430, 431 (7th Cir. 2008)(same suit, FTCA judgment for United States); Hoosier v. Rasmussen, 90 F.3d 180, 184 – 85 (7th Cir. 1996)(different suits, FTCA judgment for United States); Gasho v. United States, 39 F.3d 1420, 1437 (9th Cir. 1994) (different suits, FTCA judgment for United States); Arevalo v. Woods, 811 F.2d 487, 490 (9th Cir. 1987)(same suit, FTCA judgment for plaintiff); Estate of Trentadue *ex rel.* Aguilar v. United States, 397 F.3d 840, 858 (10th Cir. 2005)(same suit, FTCA judgment for plaintiff)*;* Farmer v. Perrill, 275 F.3d 958, 959 (10th Cir. 2001)(different suits, FTCA judgment for United States); Engle v. Mecke, 24 F.3d 133, 134 – 35 (10th Cir. 1994)(same suit, FTCA judgment for plaintiff); Freeze v. United States, 343 F. Supp. 2d 477, 481-82 (M.D.N.C. 2004), aff'd 131 F. App'x. 950 (4th Cir. 2005), *aff'd* 131 F. App'x. 950 (4th Cir. 2005)(per curiam)(same suit, FTCA judgment for United States); but see Kreines v. United States, 959 F.2d 834, 838 (9th Cir. 1992) (holding that where FTCA and Bivens claim were brought in the same action, plaintiff could proceed after FTCA judgment entered in favor of United States).

However, significant to this case, the Supreme Court has declared a limited exception to the judgment bar when an FTCA action is dismissed pursuant to one of the FTCA's enumerated exceptions. See Simmons v. Himmelreich, 136 S.Ct. 1843 (2016)(judgment bar does not apply to dismissals pursuant to the FTCA's discretionary function exception).

Accordingly, had Plaintiff's assault and battery claims not been dismissed with prejudice pursuant to the FTCA discretionary function exception by Chief District Judge Gina Groh in Case No. 3:16cv30, Plaintiff's Bivens' complaint alleging excessive force against the same COs over the same incident and injuries could have been dismissed with prejudice here, pursuant the judgment bar. Instead, they must be given review. Moreover, because Plaintiff's FTCA medical

negligence claim was dismissed without prejudice, here, Plaintiff's deliberate indifference claims must be given review. Finally, it does not appear from the record of the FTCA action that Plaintiff raised his retaliation claim there, thus, it too will be given review.

## C. <u>Exhaustion of Administrative Remedies</u>

A <u>Bivens</u> action, like an action under 42 U.S.C. § 1983, is subject to exhaustion of administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002). Under the PLRA, a prisoner bringing an action with respect to prison conditions under <u>Bivens</u>, § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997e(a). Exhaustion as provided in § 1997e(a) is mandatory and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[5] and is required even when the relief sought is not available. <u>Booth v. Churner</u>, 532 U.S. 731, 741 (2001). Because exhaustion is a prerequisite to filing suit, all available administrative remedies must be exhausted *prior to* filing a complaint in federal court. <u>See</u> <u>Porter</u>, 534 U.S. at 524 (citing <u>Booth</u>, 532 U.S. at 741).

Moreover, in <u>Woodford v. Ngo</u>, 548 U.S. 81, 93-94 (2006), the Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons"; (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case;" and (3) to "reduce the quantity and improve the quality of prisoner suits." Therefore, the PLRA exhaustion requirement requires *full* and *proper* exhaustion. <u>Id.</u> at 92. Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system. <u>Id.</u> at 103.

---

[5] <u>Porter</u>, 534 U.S. at 524.

The United States Supreme Court has held that "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints," nor do they have the burden of proving it. Jones v. Bock, 549 U.S. 199, 216 (2007); see also Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008). Prison officials have the burden of proving that the inmate had available remedies which he did not exhaust. See Dale v. Lappin, 376 F.3d 652, 655 (7th Cir. 2004)("Although exhaustion of administrative remedies is a precondition to a federal prisoner filing a Bivens suit, [citations omitted] failure to exhaust is an affirmative defense that the defendants have the burden of pleading and proving." (citations omitted)); Walsh v. Berkebile, 2011 U.S. Dist. LEXIS 43914, *16, 2011 WL 1547908 (S.D. W. Va. Feb. 22, 2011).

The Bureau of Prisons ("BOP") provides a four-step administrative remedy process beginning with attempted resolution with prison staff (BP-8). If the prisoner achieves no satisfaction informally, he must file a written complaint with the warden (BP-9) within twenty (20) calendar days of the date of the occurrence on which the complaint is based. If an inmate is not satisfied with the warden's response, he may appeal to the regional director of the BOP (BP-10) within twenty (20) calendar days of the warden's response. Finally, if the prisoner has not received any satisfaction, he may appeal to the Office of the General Counsel (BP-11) within thirty (30) calendar days of the date the Regional Director signed the response. An inmate is not deemed to have exhausted his administrative remedies until he has filed his complaint at all levels. 28 C.F.R. § 542.10-542.15; Gibbs v. Bureau of Prison Office, FCI, 986 F. Supp. 941, 943 (D. Md. 1997).

Within the BOP record-keeping system, each administrative remedy request is assigned a six-digit numerical ID or case number, as well as an alpha-numeric suffix, which identifies the

specific level in the administrative review process. Thus, the suffix "F" identifies a remedy request at the institutional (the facility) level; the letter "R" represents the Regional Office level; and the letter "A" indicates the General Counsel, or the Central Office level. For each specific remedy request, the numerical ID, or case number, remains the same, while the alpha-numeric suffix may change, depending upon the progression of the request through the various levels of administrative review. Furthermore, at each level, the letter is followed by a number, for example, "F1," which indicates the inmate has filed once at the institutional level. If the inmate is rejected at that level and re-files the appeal at that level, the suffix would be "F2."

Despite the fact that the Supreme Court has stated that it "will not read futility or other exceptions into statutory exhaustion requirements," Booth, 532 U.S. at 741, n.6, several courts have found that the mandatory exhaustion requirement may be excused in certain limited circumstances. See Ziemba v. Wezner, 366 F.3d 161, 163 (2nd Cir. 2004) (defendant may be estopped from asserting exhaustion as a defense when defendant's actions render grievance procedure unavailable); Mitchell v. Horn, 318 F.3d 523, 529 (3rd Cir. 2003) (summary dismissal for failure to exhaust not appropriate where prisoner was denied forms necessary to complete administrative exhaustion); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) (remedy not available within meaning of § 1997e(a) when prison officials prevent a prisoner from utilizing such remedy); Aceves v. Swanson, 75 F. App'x 295, 296 (5th Cir. 2003) (remedies are effectively unavailable where prison officials refuse to give inmate grievance forms upon request). Indeed, the Fourth Circuit has held that "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

Furthermore, a number of courts of appeals have held that prison officials' threats of violence can render administrative remedies unavailable. See, e.g., Turner v. Burnside, 541 F.3d 1077, 1085 (11th Cir. 2008); Kaba v. Stepp, 458 F.3d 678, 686 (7th Cir. 2006); Hemphill v. New York, 380 F.3d 680, 688 (2nd Cir. 2004). But see Larkin v. Galloway, 266 F.3d 718, 723-24 (7th Cir. 2001) (failure to exhaust not excused because plaintiff was afraid of retaliation). For threats or intimidation to render administrative remedies unavailable, they must typically be substantial and serious enough that they would deter a similarly situated prisoner of ordinary fitness from pursuing administrative remedies. See Turner, 541 F.3d at 1085; Kaba, 458 F.3d at 684-86; Hemphill, 380 F.3d at 688.

Here, Plaintiff simultaneously and contradictorily asserts both that he fully exhausted his administrative remedies [ECF No. 1, § E at 10] and that he failed to exhaust, because "administrative relief was not available" to him. Id., § D at 10. He avers that he "received grievances from other counselors and mailed to region. But I was unalbe [sic] to continue. Counselors was [sic] ordered not to submitt [sic] greviences [sic] to inmates not inside their units." Id.

The Defendants contend that Plaintiff did not complete the administrative remedy process on his claims, and that he has presented no evidence suggesting that filing an administrative remedy would be inadequate or not provide the requested relief. In support of this, they provide a sworn Declaration from Howard Williams ("Williams"), Legal Assistant and Administrative Remedy Clerk for the BOP's Mid-Atlantic Regional Office ("Williams Decl."), stating "[a]ccording to my search conducted on January 27, 2017, Petitioner [sic] has not completed the administrative remedy process during his designation to the BOP in regard to these allegations." See ECF No. 32-5, ¶ 5 at 3. However, Defendants did not produce copies of any of Plaintiff's

administrative remedies or the responses thereto, nor did they produce any summary of Plaintiff's Administrative Remedy records from the BOP's computerized SENTRY database, to elucidate how Plaintiff allegedly defaulted on the exhaustion process. Other than Williams' broad, general assertion that Plaintiff did not complete the exhaustion process, Defendants provide no detail to support their contention that Plaintiff failed to exhaust his claims.

A careful review of the record reveals that among the 94-pages of exhibits Plaintiff filed on May 15, 2017, were 49 separate nearly-illegible, self-created, hand-written "cop-outs,"[6] addressed variously to "dental," "SIS or SIA," "Captain Gilly," "AW Odom," "Sick Call," "Unit Manager Craddit," "PA Meyers," "Warden Terry O'Brien," "medical," "CMC," and/or "Charles Samuel, Director of BOP." None of these are on the required BOP BP-8 form; rather, they are handwritten on lined paper, dated and with specific times of day noted, much like diary entries. Each one reiterates Plaintiff's many allegations regarding being slammed face-first into the wall, his various resultant injuries and physical complaints, and the subsequent alleged denial of his medical care. See ECF Nos. 58-4, 58-5, 58-6, 58-7, 58-8, 58-9, 58-10, 58-11, 58-12, & 58-13. In them, Plaintiff repeatedly claims that "[t]his is a hand written copout because I'm being denied request forms in the SHU." See e.g., ECF Nos. 58-5 at 1 – 19; 58-6 at 1 - 3; 58-8 at 1; and 58-12 at 1 – 4. He also specifically alleges that he cannot get BP-8 & BP-9 forms to exhaust his grievances. ECF Nos. 58-7 at 2 - 4; ECF No. 58-8 at 3; ECF No. 58-11 at 1 - 7; and/or that he cannot get BP-8, BP-9, BP-10, and BP-11 forms. ECF No. 58-9 at 1; ECF No. 58-13 at 2 - 4; The "cop-outs" also allege injuries and physical needs not documented in the limited medical records available, including: the need for a back brace [ECF No. 58-6 at 2 & 3; ECF No. 58-5 at

---

[6] When beginning to present an issue of concern informally to staff within the meaning of 28 C.F.R. § 542.13(a), inmates must submit a request or complaint on a form titled "Inmate Request to Staff" (also known as a BP-8 or "cop-out form") before proceeding to the formal portion of the administrative remedies, by obtaining and completing a BP-9.

3 & 8; ECF No. 58-10 at 1]; the need for a "back support" [ECF No 58-10 at 1]; the need for an extra mattress [ECF No. 58-10 at 1]; difficulty bending and/or squatting [ECF No. 58-5 at 5, 6, 7, 8, 11, 13, 14, 15, 16, 17, 18, 19]; anal bleeding [ECF No. 58-5 at 6 - 9 and 12 - 19]; "bleeding severely boxers drenched" [ECF No. 58-5 at 10]; the need for a cane to walk with [ECF No. 58-5 at 8; ECF No. 58-6 at 2, 3]; right leg numbness [ECF No. ECF 58-5 at 10]; inability to fully straighten both legs. ECF No. 58-6 at 2 – 3]; and inability to fully straighten only his right leg. ECF No. 58-5 at 12 - 19. There is no notation on any of them to indicate that they were actually received by anyone. Many times, Plaintiff created several in one day, indicating writing times only minutes apart.

Also among the 94 pages of exhibits filed on May 15, 2017, Plaintiff included a copy of June 9, 2014 Request for Administrative Remedy ID # 782855-F1, alleging that Defendants Ferell and Kunkle removed him from his cell on June 5, 2014, cuffed him too tightly, searched his cell, discarded some of his personal items, including legal papers, then he was "roughly slammed against [the] wall;[7] when he protested after seeing his belongings being discarded, Defendant Todd cursed at him, calling him a racially derogatory name. ECF No. 58-19 at 1. Plaintiff also alleges that his wrist was twisted painfully, and that he was "hurting," but he does not say what part of his body was "slammed" against the wall, who slammed him, and does not allege any specific physical injury, let alone complaints of broken teeth, a gash in the forehead, concussion, back injury, anal bleeding, or denial of medical care. The remedy was stamped "received" by the Warden on what appears to be June 11, 2014, but there is no "Part B – Response" included. Id.

---

[7] Lancaster does not identify who actually "slammed him" into the wall; Artrip is not mentioned in this remedy at all.

Next, there is a June 18, 2014 Request for Administrative Remedy at the regional level, Remedy ID # 785015-R1, on which Plaintiff wrote "Sen[si]tive" at the top. It again alleges that on June 5, 2014, Todd, Ferell and B. Kunkle removed Plaintiff and his cell mate from their cell to do a routine search; cuffed Plaintiff too tightly, called him racial insults, "roughly slammed" him against the wall and twisted his wrist in an extremely painful angle. Again, Plaintiff does not say who slammed him against the wall, what part of his body made contact with the wall, or whether he was injured by the impact, only that he was "in pain" from being slammed against the wall. He makes no claim of facial laceration, broken teeth, concussion, low back injury, anal bleeding, or denial of medical care. There is no "Part B Response" to this remedy, either, but it is marked "received Jun 30 2014 Mid-Atlantic Regional Office." ECF No. 58-19 at 2.

Finally, also within the same May 15, 2017 group of exhibits, Plaintiff filed a copy of a July 14, 2014 Regional Administrative Remedy Appeal, Remedy ID # 788060-R1 alleging that:

> On 6-5-14 while being escorted off Range (7) for room to be search J. Todd placed Christopher Lancaster inside compt [sic] room – law library his cell mate Darryl Pierce 05620-067 was placed in holding cage behind office bubble by B. Kunkle. J. Todd retrieved Lancaster from law library 20 min later (check camera) [and] . . . Kunkle retrieved Pierce placing him out of range @ sight of me even attempting to kick him if B Kunkle deliberately lied which he didn't write the incident report until I was assaulted by Officer Artrip by my face being smashed into a concrete wall while restraint [sic][.] My right eye was split open @ 4 front teeth were knocked loose Kunkle's incident report is an attempt to justify the assault if you review the entire footage you will (never) see my left leg attempt any way or form to lash out at B Kunkle. He deliberately falsified an incident report in order to assist [text ends and does not continue on next page]

ECF No. 58-19 at 3. The detailed, repetitive summary of the events attached to this remedy continues for an additional seven pages, alleging for the first time that Officer Artrip told him "I can bounce your head off the wall like a basketball" and that it was Artrip who slammed him against the wall, hitting his forehead against the concrete wall not once, but three times "with such force that my front 2 teeth were chipped while splitting my eye open causing blood to gush

from the wound." Id. at 4. Plaintiff contends that this caused his knees to buckle and he passed out, whereupon he was shoved into his cell while cuffed, landing on the floor. Id. He alleges that his cellmate pleaded for medical attention on his behalf, that he was removed from his cell and taken to a holding cage, the beginning "an elaborate cover up" by Lt. Doyle and administrative staff. He contends that Nurse Hileman and Defendant Todd were present, with Defendant Ferell holding a camera, when "Nurse Hileman performed as much of an assessment as he was allowed[.] He wasn't allowed to access my busted eye, my chipped teeth, the numbness in the left portion of my right hand, my headach[e] . . . [and] dizzyness [sic] . . . the pain in my lower back . . . or . . .[where] my right wrist . . . [where] the cuffs had cut into my skin . . .blurry vision in my right eye." Id. at 4 – 5.

Plaintiff continues on, detailing all the different staff members who brushed off his pleas for medical help, the minimal medical exam he received, the requested stitches for the laceration above his eye that he was denied, the brain scan that was not done, and the spinal tap that was not performed, etc. Id. at 7. His long, rambling summary contends that he was repeatedly denied care, and Nurse Hileman told him that this denial of care was "ordered" by Lt. Doyle because "this situation had gotten out of hand too quickly and he needed to put closure on it." Id. at 8 – 9. Finally, Plaintiff concludes that it is apparent that "an internal cover up" took place to aid and assist a racist officer who used excessive force. Id. at 10. Although this remedy is stamped as "received" on July 25, 2014 by the Mid Atlantic Regional Office, there is no written response attached. Id. at 3.

Also included among the 94 pages of exhibits filed on May 15, 2017, were copies of a January 17, 2017 Administrative Remedy Rejection Notice for Remedy ID # 783058-A1, a Central Office Appeal. It was apparently received by the Central Office on January 4, 2017, and

addressed the subject of "unprofessional, inappropriate conduct or misconduct by staff." The stated reasons for rejection were:

1) Due to your allegations, your appeal is being forwarded to another department for review; hwoever [sic], your appeal was retained in accordance with policy.

2) You submitted your request or appeal to the wrong level. You should have filed at the institution, regional office, or central office level.

3) See remarks.

4) You last appealed this matter to the region on 6-16-14, 933 days later.

ECF No. 58-18.

Finally, also among the 94 pages of exhibits filed on May 15, 2017, Plaintiff included a copy of an April 20, 2017 letter from one M. Ureňa, Correctional Counselor at USP Coleman II, stating:

To whom it may concern;

On April 20, 2017 the above mention[ed] inmate was provided a copy of his BP-II Central Office remedy response dated April 07, 2017. The rejection details instructions on how the inmate should proceed with his appeal. Although the inmate's remedy submission is time bar[red], computer records showed he may have experience[d] difficulties due to his extensive stay in special housing at several institutions. The prolong[ed] stay in special housing and numerous transfers . . . would have provided limited access to remedy material and unit team staff thus, a prompt submission would have been challenging. Subsequently, unit management request[s], your office afford inmate Lancaster an opportunity to continue with his administrative remedy process.

If you need further assistance regarding this matter, please contact me at 352-689-7000[.]

ECF No. 58-20.

Plaintiff's July 13, 2017 response in opposition to Defendants' dispositive motion does not address the issue of exhaustion. However, in one document in Plaintiff's second, seven-

document August 3, 2017 response to the Defendants' dispositive motion, Plaintiff makes an unclear argument alleging that

> from 6-6-2014 – July 21, 2014 [he] attempted to contact (CMC) (unit team) (captian [sic]) (warden) (AW) (SIS) (SIA) (Charles Samules [sic]) and others in an attempt to file administrative remedies. Plaintiff got grievances from cell mates unit team and filed (sensitive 9) (BP9) (BP 10)[.] When Plaintiff unit team became aware, Celly's unit team was ordered to sign date and initial grievances so Plaintiff couldn't use them[,] prohibiting Plaintiff from filing (BP 11).

ECF No. 76 at 1. In support, Plaintiff cites to 18 U.S.C. 245 (b)(1)(B), "stating how many time[s] I have to ask before I automatically exhaust" and to BOP P.S. 3420.01 [sic], "how long I have to wake [sic] before it[']s considering me exhausting [sic]."

In another document in Plaintiff's rambling, repetitive August 3, 2107 seven-document response, Plaintiff again alleges that his "celly's unit team was ordered not to give Plaintiff any more grievances" and repeats his query regarding "how many times [an] inmate have [sic] to ask before it[']s considered an exhaustion[,] how long you have to wait before it[']s considered exhaustion (if) unit team fails to give you grievances." ECF No. 77 at 1.

As an initial point, Plaintiff's reliance on 18 U.S.C. 245 (b)(1)(B) is unavailing; that statute addresses Federally Protected Activities, not exhaustion of federal prisoners' administrative remedies. Plaintiff's reliance on BOP P.S. 3420.01 is likewise unsuccessful; there appears to be no BOP P.S. 3420.01. It is unclear whether Plaintiff intended to refer to BOP P.S. 3420.11, "Standards of Employee Conduct." However, even that Program Statement, while addressing expectations for BOP employees' general conduct, does not address expectations for BOP employees' handling of inmate grievances.[8]

There appear to be no actual administrative remedies filed regarding Plaintiff's allegations that Defendants were deliberately indifferent to his serious medical needs, beyond

---

[8] BOP P.S. 1330.13 addresses the Administrative Remedy Program.

Plaintiff's 49 separate self-created, handwritten "cop-outs," which Plaintiff dated from 7:00 am June 6, 2014 through 6:01 a.m. July 20, 2014. The undersigned notes that the inclusion of all of these self-created cop-outs contradicts Plaintiff's own claim in his August 3, 2017 response, that from June 6, 2014 through July 21, 2014, he obtained grievance forms from his cell mate's unit team and was able to file  BP-9s and BP-10s, but was never able to complete the administrative exhaustion process by filing a BP-11, because his unit team ordered his cell mate's unit  team to start signing, dating, and initialing their grievances so Plaintiff could no longer use them, thus "prohibiting Plaintiff from filing any BP-11s. <u>See</u> ECF No. 76 at 1.

It is likewise apparent from a careful review of the available record of both this case and Plaintiff's FTCA action, that despite Plaintiff's 49 cop-outs, allegedly drafted between 7:00 a.m. June 6, 2014 and 6:01 a.m. July 20, 2014, claiming he was being denied forms to file administrative remedies, he managed to file, at the very least, the June 9, 2014 Request for Administrative Remedy ID # 782855-F1; the June 18, 2014 Request for Administrative Remedy at the regional level, Remedy ID # 785015-R1; and the July 14, 2014 Regional Administrative Remedy Appeal, Remedy ID # 788060-R1, indicating that he had at least been given *some* grievance forms to use.

Plaintiff has provided nothing beyond bare allegations that because he was held in the SHU, the Defendants impeded his access to the forms needed to administratively exhaust his claims. He gives no details as to how or why he was denied the forms and does not allege that he was ever threatened for attempting to file one.  Although Fed. R. Civ. P. 8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. <u>Randall v. United States</u>, 95 F.3d 339 (4th Cir. 1996). <u>See</u> <u>also</u> <u>Dunbar Corp. v. Lindsey</u>, 905

F.2d 754, 764 (4th Cir. 1990). The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts that set forth a claim cognizable in a federal district court. <u>Weller v. Dept. of Social Services</u>, 901 F.2d 387 (4th Cir. 1990). Moreover, the Supreme Court has held that in order to survive a Rule 12 Motion, a Complaint must offer more than "labels and conclusions," a "recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) citing <u>Bell Atlantic Corp. v. Twombley</u>, 550 U.S. 541 (2007). Facts, not conclusions, must be pled; the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id</u>. Accordingly, Plaintiff's claim that Defendants interfered with his administrative remedies is not credible.

Nonetheless, notwithstanding that it appears from the incomplete record before the undersigned that Plaintiff likely drafted his "cop-outs" after the fact, creating his own paper trail to make it appear he had in fact attempted to exhaust his administrative remedies, because it is the Defendants' burden to prove failure to exhaust, and the Defendants' response fails to adequately address the issue, the undersigned will analyze Plaintiff's remaining claims to determine whether Plaintiff's complaint states a valid Eighth Amendment claim.

## D. <u>Excessive Force: Officer Artrip, Officer Ferell, B. Kunkle, J. Todd, Lt. Doyle, Assistant Warden Odom, Executive Assistant Thompson, and C. Bennet</u>

In general, the Eighth Amendment prohibits "cruel and unusual punishment." <u>Farmer v. Brennan</u>, 511 U.S. 825 (1994). To comply with the Eighth Amendment, prison punishment must comport with "the evolving standards of decency that mark the progress of a maturing society." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976). However, while courts should give deference to a

prison official's determination of what measures are necessary to maintain discipline and security, "the unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment prohibited by the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 321-22 (1986). For a plaintiff to prove a claim of excessive force, he must first demonstrate that "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Hudson v. McMillian, 503 U.S. 1, 8 (1992) (quoting Wilson v. Seiter, 501 U.S. 294, 298, 303 (1991)). Second, he must show that prison officials inflicted unnecessary and wanton pain and suffering. Id. at 6.

With regard to prison disturbances, whether unnecessary and wanton pain and suffering was inflicted "ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21. To determine whether an official acted maliciously and sadistically, the following factors should be balanced: (1) "the need for application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of the injury"; (4) "the threat reasonably perceived by the responsible official"; and (5) "any efforts made to temper the severity of a forceful response." Id. at 321; Williams v. Benjamin, 77 F.3d 756, 762 (4th Cir. 1996). The Supreme Court has made it clear that the core judicial inquiry in an excessive force claim is not "whether a certain quantum of injury was sustained, but rather, whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (citation and internal quotation marks omitted). Instead, the extent of injury is one factor to consider, but it "does not end [the analysis]." Hudson, 503 U.S. at 7.

Here, Plaintiff contends that during May and June, 2014, the evening shift COs repeatedly refused" to plug in his breathing machine for him, but instead, made him wait for the night watch officers to do it. ECF No. 1 at 11. When he complained to the "2nd shift Lieutenant" about the evening shift officers' behavior, in retaliation, on June 5, 2014, Defendants J. Todd, B. Kunkle, and Ferell came to his cell and ordered him and his cellmate to submit to restraints, and then escorted them out of their cell to a holding cage. Id. at 12. Plaintiff contends that the officers threw all of his and his cellmate's belongings into the hallway, including his personal and religious books and hygiene, sweeping it all "off range." Id. When Plaintiff saw this and complained, Defendant Todd "slammed him into wall and sneered "fuck you and your property." Id. Officer Artrip came behind Plaintiff and twisted his wrist in an "extremely painful angle" and stated "fuck this coon." Walk bitch." Id. at 12 – 13.

Plaintiff alleges he was "forced to walk on my tip toes" with Officer Artrip, who continued calling him racial slurs; when nearing the holding cell, Artrip stated "[n]igga I can bounce your head off the wall like a basketball and won[']t [sic] a dam[n] thing happen to me." Id. at 13. Plaintiff contends that Artrip then "wheeled Plaintiff face first to wall[,] placed his palm on the back of Plaintiff['.]s head and slammed his face into the concrete wall with such force that (4)" of Plaintiff's front teeth chipped loose causing one to eventually fall out, splitting Plaintiff's right eye open leaving a bloody 2-inch gash, finally knocking Plaintiff unconscious. Id. When Plaintiff "came back,"[9] Lieutenant Doyle, J. Todd, B. Kunkle, entered his cell, along with Defendant Ferell, who held a video recorder. Todd and Kunkle "seized Plaintiff from the floor . . . [and] literally drug Plaintiff to [the] holding cage behind officer['.]s station due to his disorderly state." Id. Plaintiff alleges that once inside the holding cell, he was dropped on the floor. Id. at 12.

---

[9] The undersigned assumes that by "came back," Plaintiff means when he regained consciousness.

Plaintiff's complaint also appears to allege that at 1:11 p.m. on June 6, 2014, Assistant Warden Odom and Executive Assistant Thompson "came through to view [his] injuries" and he attempted to speak with them about the excessive force incident but Odom told him he could not talk about it "in case your [sic] trying to get a lawsuit." Id. at 15. Plaintiff alleges he gave Odom two cop-outs, seeking to have all camera footage of the incident saved to be reviewed by SIS and his attorney. Id. Plaintiff contends that at 1:35 pm on June 6, 2014, he gave Defendant C. Bennet a cop-out to give to the Associate Warden, Defendant Odom. Id.

Defendants deny that any excessive force was used; in support of their argument, they produce a DVD containing an approximately 4-minute-long Vicon surveillance video footage of the June 5, 2014 incident for an *in camera* review. See ECF No. 32-6. The video has no sound. A careful review of the same shows a long hallway with cell doors on the left, and a white, barred door at the far end. The video begins at 7:36:02 pm, as the door at the far end of the hallway opens, and an inmate (apparently Plaintiff's cellmate) appears, accompanied by a CO; the inmate appears to have his hands restrained behind his back and the CO appears to be holding his right arm lightly; they begin walking slowly up the hallway toward the camera; this inmate has a slow, shuffling gait. At 7:36:22 p.m., the inmate turns to his left to look behind him, where unknown others are gathered at the door. The C.O. continues walking and the inmate goes along. At 7:36:49 p.m., the inmate briefly wavers to his left slightly, as if attempting to go toward a small rectangular lime green object lying on the right side of the hallway floor; the CO redirects him by tugging gently on his right arm, and he immediately returns to the original course he was walking. At 7:36:57 p.m., they arrive at the last visible cell doorway on the left side of the hall, and the CO ushers the inmate inside; he disappears from the screen. The CO

remains standing in the hallway, at the door of the cell, visible in the lowermost left corner of the screen.

At about the same time, figures become more visible in the doorway at the far end of the hall. At 7:37:02, another inmate (Plaintiff) enters the doorway, flanked on either side by COs who appear to be holding him firmly by either arm; he, too, appears to have his hands cuffed behind his back. The trio begins walking briskly up the hallway. At 7:37:11 p.m., the CO standing at the cell door turns to watch their approach. There are at least two other COs behind the trio, also walking up the hall, but at a slightly slower pace, and it appears that at least one other CO may still be standing back in the doorway. The trio arrives at the cell door at approximately 7:37:27 p.m.; Plaintiff begins to turn to his right, toward the cell door and the CO who was standing there steps back slightly, as if to make room for him to pass.

At 7:37:29 p.m., the CO who was waiting at the door appears to step forward to take Plaintiff's left arm as the two COs who were originally escorting Plaintiff begin to relinquish their grips on his arms and stand back slightly, to permit him to go through the doorway. At this point, all involved are so close to the camera that they are only visible from the waist up. A sudden altercation of some sort occurs; Plaintiff appears to resist having the waiting CO take his arm and jerks his body away; the two COs who originally escorted him immediately step forward and press him against the wall/door frame; one of them laces his hand behind Plaintiff's head, then grips his hair and presses his head firmly against the wall; the other appears to push Plaintiff's left shoulder against the wall/door frame. At no time did the front of Plaintiff's face or mouth hit the wall/door frame; rather, the only surface of Plaintiff's face/head that made contact with the wall was the right side, when the CO who held his head turned it to the side before pressing it against the wall/door frame. The CO who escorted Plaintiff's cellmate and

then waited by the door appears to briefly help the other two gain control over Plaintiff before stepping back; the other two COs who followed the trio up the hall approach.

By 7:37:38 p.m., there are five COs at the scene, but only the two original escorting COs are touching Plaintiff, holding him firmly against the wall/door frame; the other three stand by. There is a sixth CO visible in the doorway at the far end of the hall, watching. The two COs restraining Plaintiff can be seen conversing with him; their facial expressions, when visible, appear calm. The back of Plaintiff's head is visible on the screen, but not his face. At one point, the CO closest to the camera shakes his head. At 7:37:47 p.m., the CO holding Plaintiff's hair appears to push his head more firmly against the wall/door frame. At 7:38:23 p.m., it appears that a mutual decision has been reached, and at 7:38:24 p.m., both COs release their hold on Plaintiff; Plaintiff's face then becomes visible at the lower left corner of the screen. He does not appear to be injured or bleeding. At 7:38:25 p.m., Plaintiff walks steadily and unaided, alone, into the doorway of the cell at the left, and then he, too, is no longer visible on the screen. None of the COs enter the cell with him and none appear to shove him.

At 7:38:28 p.m., the CO's step back away from the doorway of the cell and three of the COs raise their right arms in a wave, as if to signal to the CO standing at the end of the hallway. After standing at the doorway conversing briefly, at 7:39:09 p.m., the five COs turn and head back up toward the end of the hallway. They reach the doorway and go through it at 7:39:41 p.m. At 7:39:43 p.m., someone swings the barred door shut and locks it. The video ends at 7:40:01 p.m.

Defendants also provide a sworn Declaration of CO Derek Artrip's Declaration in support of their dispositive motion. It states in pertinent part:

> 3. On June 5, 2014, at approximately 7:50 pm., Plaintiff was being escorted from the holding cell to his assigned cell . . . when he began to actively resist the

transport. This prompted him to be placed against the wall. At this time, I assisted Officer Todd with escorting him the rest of the way to his cell.

4. When we approached the cell door, Plaintiff made an attempt to kick another officer, Officer Kunkle, who had been escorting Plaintiff's cellmate. Officer Todd and I then placed Plaintiff against the wall to prevent him from harming himself or staff members again. He was placed against the wall until he regained control of himself. The only officers escorting Plaintiff at this time were myself and Officer Todd. No other officers assisted us while we regained control of the situation by placing Plaintiff against the wall; nor did any other officers assist us when returning Plaintiff to his cell.

5. While resisting, he inadvertently hit his head on the side of the cell door resulting in a small superficial abrasion over his right eye. After he calmed down, he was placed into a cell without further incident.

6. After Plaintiff was placed in his cell, I notified the Operations Lieutenant and Health Services Staff, and a medical assessment of Plaintiff was completed. I sustained no injuries from the transport.

7. I deny that I used excessive force to subdue Plaintiff. He became combative and resistant, and thus we used appropriate force necessary to subdue him and protect the safety of Plaintiff, other inmates, and officers.

8. At no time did I yell racial slurs or obscenities at Plaintiff. Additionally, I did not throw him into a cell.

9. The only injury I am aware of that Plaintiff sustained was the small abrasion over his right eye. Following the incident, I drafted a memorandum to the Operations Lieutenant explaining the facts of the situation, as expressed above.

ECF No. 32-2 at 2 - 3.

A careful review of the record, specifically, Defendant Artrip's Declaration, *supra,* suggests that there were likely two incidents where Plaintiff was "placed against the wall;" once when Plaintiff was being escorted from the holding cell to his assigned cell [see id., ¶ 3, *supra*], and then again when the COs arrived with Plaintiff at his cell door, visible on the video. See id. at ¶ 4, *supra*. Nonetheless, even if there were a prior incident that day, it is moot, given that it is apparent that Plaintiff sustained no injury in the first, because his face is clearly visible during the walk down the hallway and he was not bleeding from a gash on his forehead or from broken

teeth in his mouth. Nor was Plaintiff being "forced to walk on his tiptoes;" he walked unaided, although it is apparent that the COs are holding his arms much tighter than the CO held his cellmate's arm during his walk down the hall only moments before, lending an inference that something happened before the walk began, to warrant the COs' heightened vigilance. Finally, it is readily apparent that Plaintiff was not slammed face-first into the wall, knocked unconscious, or thrown or shoved onto the cell floor, as he claims. Although there is no audio to the Vicon footage, it is obvious from the COs' body language and facial expressions that none of the COs involved were berating, shouting at, or cursing Plaintiff during the less-than-one-minute of time he was restrained against the wall, before being released and permitted to enter the cell. See ECF No. 32-6 at 7:37:29 – 7:38:24.

In sum, the undersigned agrees with Chief District Judge Gina Groh's assessment of Plaintiff's claims of excessive force, finding that the video surveillance evidence did not support the claim.[10] Plaintiff has failed to present any evidence to dispute the surveillance video evidence and Defendants' assertions that the force applied on June 5, 2014 was applied in a good-faith effort to maintain or restore discipline, and not maliciously and sadistically to cause harm. Accordingly, the undersigned finds that there is no genuine issue of material fact to preclude summary judgment for Defendants on this claim, and Plaintiff's June 5, 2014 excessive force claims should be dismissed because they are so lacking in merit that they not only fail to state a claim but are also frivolous.

**E. Deliberate Indifference to Serious Medical Needs: Christopher Meyer, PA, Lt. Doyle, C. Troopman, D. Jones, Lt. Harrison, Nurse Hileman, Nurse Dawson, Nurse Fowler, Executive Assistant Thompson, Merkergo, Bradly, Allison, Andrews, Boyard, J. Todd, B. Michaels, and Sherk**

---

[10] See Lancaster v. United States, Case No. 3:16cv30, ECF No. 85 at 10, n.6.

To state a cognizable claim for denial of medical care in violation of the Eighth Amendment, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 105 (1976). A medical condition is "serious" if "it is diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention." Gaudreault v. Muncipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994). Basically, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistence." Id. at 844.

Plaintiff asserts that these Defendants, including Defendant PA Meyer, repeatedly refused to assess his injuries and/or provide needed medical attention after the June 5, 2014 incident.[11] Specifically, he alleges that after he was dropped [ECF No. 1 at 12] or slammed to the cell floor floor [id. at 14] after the altercation, J. Todd, B. Kunkle, Lt. Doyle, along with Defendant Ferell and Nurse Hileman entered the holding cage. Nurse Hileman began videoing Plaintiff's injuries; when Plaintiff began "telling all that had occurred" Lt. Doyle "can be heard ordering" Plaintiff to shut up. Id. at 12 – 13. When Plaintiff did not, Lt. Doyle ordered Nurse Hileman to stop the medical assessment and ordered Plaintiff to be returned to his cell. Plaintiff alleges that when

---

[11] Even if Plaintiff had stated a valid claim of deliberate indifference to serious medical needs against Defendant Meyer, because Meyer has been a commissioned officer in the Public Health Service since August 3, 2012, he is entitled to absolute immunity from suit in this Bivens action for all claims arising from the medical care he provided to Plaintiff, and he would be entitled to be dismissed from this action on that ground.

Nurse Hileman asked about the stitches he was supposed to receive, Lt. Doyle stated "fuck him" and he was returned to his Tier 7 cell. Id. at 13. Plaintiff contends that during the 9:30 p.m. rounds, he asked J. Todd for medical attention and was "ignored." Id. at 15. He alleges he asked "Sherk" at 10:12 p.m. rounds and Sherk "just shrugged and walked off." Id. He alleges that at 1:53 a.m., Lt. Harrison told him "you definately [sic] need stitches." Id. Plaintiff contends that when he asked P.A. Meyers for stiches, Meyers "snorted and said 'you'll live.'" Id. Further, he alleges that Meyer told him his blurred vision, dizziness and headaches would go away, and when he complained of pain in his teeth, Meyer told him "don't brush for a day or 2." Id.

Plaintiff alleges that around 5:00 a.m. the following morning, his cellmate "detected irregularities" in Plaintiff's breathing. Id. at 13. Minutes later, Lt. Harrison arrived, assessed the situation, and summoned medical. Id. After being assessed, Plaintiff was placed in a wheelchair and taken to medical, where PA Meyers checked his blood pressure and pupils and told Lt. Harrison that Plaintiff had a "slight concussion" but refused to provide any further medical care. Id. at 13 & 15. Despite Plaintiff's complaints of headaches, dizziness, blurred vision, back pain, aching gums, he was "ignored and wheeled back to his cell." Id. at 15. Further, he alleges that at 9:35 am on June 6, 2014, Defendant D. Jones saw his forehead told him he definitely needed stitches. Id. at 14. Plaintiff alleges he also asked C. Troopman about his injuries during this same morning rounds.[12] Id. at 14. Plaintiff further contends that at the 3:20 p.m. pill call, he asked Nurse Hileman why he wasn't being given medical attention, and Hileman stated that he was ordered not to, by Lt. Doyle, because "the situation had gotten out of hand too quickly." Id. at 15. Hileman also told Plaintiff that Meyers directed him to refrain from giving Plaintiff any more medical attention. Id. at 16.

---

[12] Plaintiff does not say what Troopman's response was.

Plaintiff makes another brief, unclear claim against C. Troopman, appearing to allege that when he asked Troopman about getting medical care on an unspecified date, Troopman told him he could not speak about the incident and "evaded the conversation." Id. at 15.

Plaintiff also asserts that between June 6 – June 7, 2014, he asked J. Todd and B. Michael for medical attention and was "ignored." Id. On "first shift," he asked Defendants Merkergo, Bradley, Allison, Andrews, and Boyard for medical attention and was ignored. Id. When he asked to speak to the Lieutenant, he was ignored. Id. On the second shift, when he asked J. Todd and B. Michaels for medical attention, he was denied attention and denied the right to speak to a Lieutenant. Id. Plaintiff also alleges that on June 7, 2014, Defendant Nurse Fowler told him that it was Meyers' orders not to medically treat him, even though the cut over his eye "was still bleeding heavily." Id.

Plaintiff avers that at the 3:20 p.m. pill line on June 8, 2014, Defendant Nurse Fowler finally gave him 2 alcohol pads and bandages for his eye, but that at 5:00 p.m. when he asked Defendant Nurse Dawson for medical attention, he was told he could not have it because it was P.A. Meyers' orders. Id.

Defendants' memorandum in support of their dispositive motion disputes both the level of Plaintiff's injuries as well as Plaintiff's contention that he was denied medical care after the incident. In support, they provide the Declaration of Physician's Assistant ("P.A.") Christopher Meyer, who states in pertinent part:

1. I, Christopher Meyer, have worked for the Bureau of Prisons since February 2011. I am currently a Physician Assistant at the United States Penitentiary in Hazelton, West Virginia ("USP Hazelton"). I was commissioned in the Public Health Service on August 3, 2012.

2. According to the medical record, on June 5, 2014, medical staff member Nurse Gary Hileman, was called to assess an immediate use of force injury for inmate

Christopher Lancaster, ("Plaintiff"), Federal Register Number 25878-056. The assessment of Plaintiff took place at 19:50 on June 5, 2014.[13]

3. Plaintiff reported that he had a cut on his right eyebrow and a chipped tooth. According to his medical record, at the time, Plaintiff appeared irritable, agitated, and anxious. His appearance was alert and oriented and Nurse Hileman documented no signs of severe pain or distress. The only injury noted in the medical record was a small superficial laceration to the right side of his head. Bleeding at the wound was controlled, and it was cleaned and assessed. There were no stitches or sutures applied to the wound. Plaintiff was instructed to follow up at Sick Call as needed.

4. On June 9, 2014, I treated Plaintiff for complaints of intermittent headaches and soreness to his right eyebrow. At this time he mentioned the immediate use of force incident with staff as the reason for his complaints. **I examined Plaintiff, and noted in his medical record that his right eyebrow laceration was well healed, and there were no signs of infection or bleeding**. Plaintiff presented as argumentative about the incident with staff during his visit. I provided proper care for his complaints and told him to follow up as needed, and suggested over the counter medication should symptoms persist.

5. I also treated Plaintiff on July 7, 2014. During this visit he complained of a chipped tooth, headache, and intermittent dizziness. He again attributed these symptoms to the incident with staff in June, though I noted in his medical record that the initial altercation medical assessment was not consistent with his alleged extended symptoms. **I also noted that at the time of the examination I suspected malingering/health seeking behavior**. I properly treated him for his complaints and told him to follow up as needed.

6. Plaintiff was seen on multiple more occasions during his incarceration for various complaints. **On September 2, 2014, after being seen multiple times throughout July and August, 2014, Plaintiff again complained of the June 2014 incident, this time claiming he had four chipped teeth**. There is no record of this injury in his encounters with Health Services.

---

[13] This assertion is supported by a copy of a BOP Health Services Clinical Encounter Plaintiff produced in his FTCA action on the same claims. The encounter did occur on June 5, 2014, albeit a half-hour later than reported by Meyer, having occurred at 8:19 p.m., when Gary Hileman RN examined Plaintiff, and documented Plaintiff's reported symptoms: "cut right row. also chip tooth." See Case No. 3:16cv30, ECF No. 71-20 at 2. Hileman's own assessment was: "Cut(s) and/or Abrasion(s)). Injury assessment . . . inmate was being escorted when officers had to use immediate use of force inmate was placed against wall resulting in small laceration to right eye brow, bleeding controlled[.] Wound will be cleaned and assess[ed][.] No other injuries noted[.]. Id. Of note, Plaintiff did not advise Hileman that he had been slammed face-first against a concrete wall, sustaining four chipped teeth, and a head injury, blurred vision, dizziness, or that he had been thrown or shoved to the floor, sustaining a back injury. Hileman provided a sworn Declaration in the FTCA action, submitted by the Government in support of its dispositive motion, wherein he stated that, "Plaintiff reported that he had a cut on his right eyebrow, and a chipped tooth. . . I documented no signs of severe pain or distress. The only injury I noted was a small superficial laceration to the right side of his head," and "no stitches or sutures [were] applied to the wound." See Case No. 3:16cv30, ECF No. 36-3 at 2.

7. According to the medical record, on multiple occasions while housed at USP Hazelton, Plaintiff was given verbal warnings due to noncompliance with Health Services rules and continued noncompliance with proper ingestion of his medication. Plaintiff's medical claims were inconsistent throughout his encounters with medical staff from June 2014- November 2014, until he was transferred to another institution.

ECF No. 32-4 at 2 – 3 (emphasis added).

Defendants also provided the Declaration of Registered Nurse Chad Fowler, who states in pertinent part that:

2. On June 8, 2014, at approximately 13:30, I treated Plaintiff in the Special Housing Unit. Subjectively, Plaintiff stated "I think I need stitches."

3. During the encounter, he complained of continued bleeding from an abrasion near his right eyebrow from a contusion suffered two days prior. He stated again "I need stitches," which I noted in his medical record.

4. I assessed the area based upon Plaintiff s complaints. It showed no signs of active bleeding or any forms [sic] of discharge. There were scant amounts of dried blood noted. **Plaintiff stated that he had been scrubbing it to keep it clean, which seemed to be the cause of any continued bleeding**.

5. During the assessment, Plaintiff expressed inconsistent complaints of blurry vision from his right eye, which changed to an inability to see out of his eye. I assessed his pupils which were reactive to stimuli bilaterally. He did not complain of pain or dizziness.

6. As I attempted to obtain further information as to Plaintiff's visual acuity, Plaintiff altered the conversation and began stating his medical care should proceed. Throughout the majority of the medical assessment, Plaintiff was argumentative and complained about medical care, attempting to debate with Health Services.

7. I instructed the Plaintiff to clean the abrasion by gently dabbing the site with warm water and soap rather than scrubbing. I also instructed him to return to sick call in the morning if his condition worsened.

8. When asked, Plaintiff would not verbalize an understanding of my instructions. He continued to debate with Health Services staff rather than further explain his apparent condition.

ECF No. 32-3 at 2 – 3 (emphasis added).

Inexplicably, although not produced in this case and not mentioned in PA Meyer's sworn Declaration, in Plaintiff's FTCA case filed over the same incident and injuries, Plaintiff produced a copy of a June 6, 2014 9:58 a.m. BOP Health Services Clinical Encounter, where he was seen and examined by Defendant PA Christopher Meyer.  Meyer noted that Plaintiff reported "use of force yesterday approx. 8pm with contusion to right orbit. inmate states orbit sore and blurry vision OD. has a headache. has taken no OTC tx for symptoms." (all punctuation and grammatical errors in original).  See Case No. 3:16cv30, ECF No. 71-19 at 1.  There is no mention of Plaintiff reporting even one, let alone four broken teeth, or having been slammed on the floor and sustaining a back injury. Meyer also noted that Plaintiff had a "right brow with 1 cm superficial abrasion. no current bleeding. tissues appear approximated well. no erythema or signs of infection. 2 cm hematoma lateral right orbit." Id. (all punctuation and grammatical errors in original).  Meyer's assessment was "[a]cute post-traumatic headache . . . Current, Temporary/Acute, Not Assessed; Contusion of orbital tissues . . . Current, Temporary/Acute, Initial. Id. at 2. Meyer prescribed Ibuprofen 800 mg three times a day for four days; instructed Plaintiff to follow up at sick-call as needed; and "discussed expectations with head injuries. rest. avoidance of exertional activities x 2-3 wks. alert if symptoms change. no neurological deficits at this time." Id.  Plaintiff verbalized understanding. Id.

Further, in the October 5, 2015 FTCA Administrative Tort letter, produced by Plaintiff in that case, Matthew Mellady, Regional Counsel for the BOP's Mid Atlantic Regional Office notes that Plaintiff's only reported injuries from the use of force incident were "a small laceration above your right eyebrow.  Records indicate your injury was evaluated and treated by Health Services Staff at 8:19 p.m. on the same day with no follow-up required." See Case No. 3:16cv30, ECF No. 26.

It appears, then, that Plaintiff's only visible injuries from the June 5, 2014 incident were a one-centimeter abrasion or superficial laceration over the right eyebrow and a two centimeter hematoma in the same area. One centimeter is only 0.393701 inches long and a two-centimeter hematoma is only 0.787402 inches. It is also apparent that Plaintiff made no complaint to Meyer, only hours after the incident, of having four chipped teeth from the incident.

Plaintiff also produced a copy of a June 12, 2014 12:56 p.m. BOP Health Services Dental Soap/Admin Encounter, where he was seen by one James Mixson, DMD ("Mixson") for complaints of toothache, and that Plaintiff reported "[m]y tooth are [sic] chipped and hurt (points to upper right)." ECF No. 58 at 1. Plaintiff reported pain of a level 6 on a scale of 1 – 10; Mixson documented that the trauma to Plaintiff's teeth occurred on June 5, 2014 from a "blow to maxillary teeth with incisal chipping #6, 7 and 9." Id. Mixson performed x-rays, and did a composite restoration on tooth #9, Plaintiff's left central incisor, by etching it, applying Optibond and placing an A-3 Tetric EvoCeram filler. However, while the dental findings for teeth # 6, 7, and 9, was that they were chipped, Mixson also documented that tooth # 8 had "[p]eriapical radiolucency (Radiological Observation/Findings)(yes) Swelling in Vestibule (Clinical Observation/Findings)(yes)." Id. This "periapical abscess without sinus" was listed as "Current, *Chronic*, Initial." Id. (emphasis added). Treatment of that tooth included

> [l]ingual access maxillary right central incisor (#8). **Necrotic pulp without drainage**. WL 24 mm from incisal verified with PA radiograph. Filed to WL with #30 file. Copious irrigation with sodium hypchlorite. Dried canal with paper points, placed calcium hydroxide, cotton pellet place [sic] over canal and sealed with white Fugi Triage. POI given.

Id. at 2 (emphasis added). It is apparent from this note that whatever the problem with this tooth was, it was, as Mixson noted, a *chronic* problem, not an acute problem related to trauma that had occurred as recently as seven days earlier, given that there was already an advanced abscess with

necrotic pulp; such a finding would only develop over an extended period of time, usually as a result of poor dental hygiene.[14] Further, it is important to note that Mixson's notation that Plaintiff's teeth were damaged in a June 5, 2014 traumatic injury was merely Mixson's reporting what Plaintiff *had told him*. As noted *supra*, given that the surveillance video showed that there was no blow to Plaintiff's front teeth during the June 5, 2014 incident to cause chipping to his front teeth, and Plaintiff himself made no mention of any problems with his teeth when he was seen by PA Meyer on the morning of June 6, 2014, fourteen hours and twenty minutes after the incident occurred, it seems apparent that over time, Plaintiff began and has continued to embellish his medical/dental claims.

Even if it were possible that Plaintiff's claimed injuries were a result of the June 5, 2014 use of force, given the clear evidence to the contrary in the surveillance video, the undersigned does not find that they are. Moreover, Plaintiff's complaints of deliberate indifference to his serious medical needs are completely belied by a thorough review of the record of both his FTCA and this case. The records provided by Plaintiff in both actions reveals that contrary to his claim that his requests for medical attention were "ignored," he was provided with medical attention immediately after the incident by RN Hileman [see ECF No. 32-4, ¶¶ 2 & 3 at 2] and again the morning of the following day by PA Meyer, after which PA Meyer specifically advised him to follow up at sick call as needed. See Case No. 3:16cv30, ECF 71-19 at 2. He was seen again by RN Chad Fowler at 1:30 p.m. on June 8, 2014. See ECF No. 32-3 at 2 - 3. PA Meyer saw him again on June 9, 2014. ECF No. 32-4, ¶ 4 at 2 – 3. He was seen by the dentist on June

---

[14] A periapical abscess is the most common type of abscess, and it starts in the center of the tooth (the dental pulp). This type of abscess usually develops as a complication of tooth decay (caries). Dental decay is very common; it damages and breaks down (erodes) the protective layers of the tooth (the enamel and dentine), permitting bacteria to invade the pulp to cause an infection. An infection in the pulp can progress to form an abscess. See Dental Abscess: Symptoms, Causes and Treatments, available at https://www.medicalnewstoday.com/articles/170136.php

12, 2014 and had extensive dental repairs done to his teeth. See ECF No. 58 at 1. PA Meyer saw him again on July 7, 2014. ECF No. 32-4, ¶ 5 at 3. Despite Plaintiff having had the dental work done on June 12, 2014 during the BOP Health Services Dental Soap/Admin Encounter, it appears that Meyer was unaware of this fact; Meyer's sworn Declaration reports that Plaintiff was also seen on multiple other occasions for various complaints, and that his first complaint to *medical* of four chipped teeth as a result of the June 5, 2014 incident was made on September 2, 2014. ECF No. 32-4, ¶ 6 at 3. Finally, Meyer avers that Plaintiff's medical claims are inconsistent with his reports to medical staff during health service encounters from June – November, 2014, when he was finally transferred away from USP Hazelton.

Given the record before the undersigned, it is clear Plaintiff's medical and dental needs were never "ignored" and that he was not denied medical care. It appears, then, that Plaintiff was dissatisfied with the care that he received. However, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983[15] claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Treatment may be limited "to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977).

Accordingly, after a thorough review of the record of both Plaintiff's FTCA action and this case, the undersigned finds that there is no genuine issue of material fact with respect to Plaintiff's deliberate indifference claims. Because Plaintiff has failed to establish that any of these Defendants acted with deliberate indifference to his medical needs, he has failed to state a claim upon which relief can be granted. Moreover, because it is apparent from the record that

---

[15] Case law under 42 U.S.C. § 1983 is applicable to Bivens actions. See Butz v. Economou, 438 U.S. 478, 504 (1978).

Plaintiff has intentionally misstated the facts, the undersigned agrees with Judge Groh's assessment of Plaintiff's FTCA medical claims, and recommends that this claim also be dismissed as frivolous.[16]

## F. <u>Retaliation: J. Todd, B. Kunkle, Officer Artrip, and Officer Ferell</u>

In order to sustain a claim based on retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." <u>Adams v. Rice</u>. 40 F.3d 72, 75 (4th Cir. 1994). Additionally, a plaintiff alleging that a government official retaliated against him in violation of a constitutional right must demonstrate, *inter alia*, that he suffered some adversity in response to her exercise of protected rights. <u>American Civil Liberties Union of Maryland, Inc. v. Wicomico County, Md.</u>, 999 F.2d 780, 785 (4th Cir. 1993). Therefore, "*in forma pauperis* plaintiffs who claim that their constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal to survive [§ 1915(e)(2)(B)]." Id. Furthermore, claims of retaliation are treated with skepticism in the prison context. <u>Cochran v. Morris</u>, 73 F.3d 1310, 1317 (4th Cir. 1996).

Here Plaintiff alleges that in retaliation for his complaining to the "2nd shift Lieutenant" about the COs' refusal to plug his breathing machine in for him on the evening shift during May and June, 2014, on June 5, 2014, Defendants Todd, Kunkle, and Ferell came to his cell and removed Plaintiff and his roommate to a holding cage. ECF No. 1 at 11 - 12. Plaintiff contends that the COs then threw all of his and his cellmate's belongings into the hallway, sweeping it all "off range." <u>Id.</u> When Plaintiff complained, Defendant Todd "slammed him into wall and sneered "fuck you and your property." <u>Id.</u> Officer Artrip came behind Plaintiff and twisted his wrist in an "extremely painful angle," cursed at him and called him racially derogative names. <u>Id.</u>

---

[16] <u>See</u> <u>Lancaster v. United States</u>, Case No. 3:16cv30, ECF No. 85 at 10, n.6.

at 12 – 13. The COs then forced him to walk up the hall, then slammed his face against the wall, and threw him on the cell floor, causing the injuries noted *supra*. Id. at 13.

Liberally, construed, it appears that Plaintiff is attempting to alleges that Defendants Todd, Kunkle, Ferell, and/or Artrip retaliated against him for filing a grievance[17] over the evening shift COs' failure to plug in his breathing machine for him. However, even if true, none of these "acts of retaliation" state a constitutional violation.

First, as an initial point, a review of the surveillance video does not support any of Plaintiff's factual allegations regarding the COs cursing at and insulting him and/or forcing him to walk on his tiptoes all the way down the hall; slamming him face-first into the door frame, causing the injuries he alleges he received; or pushing/shoving him to the floor of his cell once he arrived there, knocking him unconscious and/or injuring his back.

Moreover, even if it were true that Defendants Todd, Kunkle, Ferell, and/or Artrip did retaliate against Plaintiff for filing a grievance about the evening COs' behavior, federal inmates have no constitutional right to participate in the BOP's administrative grievance procedure. See Adams v. Rice, 40 F.3d 72, 73 (4th Cir. 1994)(no constitutional right to the grievance procedures). Therefore, claims such as Plaintiff's that BOP employees retaliated against him for pursuing his complaints through the administrative process, are not appropriate claims in a Bivens action.

Likewise, Plaintiff's allegation that staff cursed at him and used racial slurs against him does not state a viable claim of retaliation. Mere verbal harassment does not give rise to a constitutional violation. See Wagner v. Wheeler, 13 F.3d 86, 92-93 (4th Cir. 1993) (verbal abuse does not amount to a constitutional violation); McBride v. Deer, 240 F.3d 1287, 1291 n. 3 (10th

---

[17] It appears that at least the two copies of incompletely-exhausted administrative remedies Plaintiff filed, No. 782855-F1 and No. 685015-R1, each allege retaliatory acts by the Defendants.

Cir. 2001) (officers threatened to spray inmate with mace; taunts and threats are not an Eighth Amendment violation); <u>Eury v. Angelone</u>, No. 01-cv-257, 2001 WL 24042606, at *4 (E.D. Va. June 11, 2001) (alleged derogatory racial remarks, even if true, are not constitutional violations).

Accordingly, Plaintiff has failed to state a claim for retaliation against Defendants Todd, Kunkle, Ferell, and/or Artrip, and this claim should be dismissed.

**G. <u>Service of Process on Defendant Justin Todd and the John Doe Defendants</u>**

To date, despite multiple attempts to identify a current address for Defendant Todd, who apparently was no longer employed with the BOP when service was attempted and had left an insufficient forwarding address, the U.S. Marshal Service was unable to serve Defendant Todd. <u>See</u> Unexecuted Summons, ECF No. 18 at 2 – 3.  Defendants' dispositive motion makes no mention of this, and Plaintiff likewise fails to mention it in his responses.

It has been nearly ten months since Plaintiff filed his complaint. Federal Rule of Civil Procedure 4(c) indicates that "[a] summons must be served together with a copy of the complaint." The time frame within which service must be effected is articulated in Rule 4(m), which provides that if service of the summons and complaint is not made upon a defendant within 90 days after the filing of the complaint, "the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant[.]"  But if the plaintiff shows good cause for the failure, "the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m); <u>see</u> <u>also</u> <u>Bush v. City of Zeeland</u>, 74 Fed. Appx. 581, 2003 WL 22097837 at *2 (6th Cir. 2003)(citations omitted).

The Plaintiff had a second opportunity to provide a service address for Defendant Todd when he received a copy of the unexecuted summons. He did not provide an updated address. The undersigned has no reasonable expectation that the Plaintiff will be able to provide an

address at which Defendant Todd can be served. Therefore, this Report and Recommendation should serve as notice to the Plaintiff that Defendant Todd will be dismissed as a Defendant in this action for failure to effectuate service of process.

In his complaint, in addition to the named Defendants, Plaintiff attempted to name "all unknown [Defendants] not listed in Complaint" as additional Defendants. As Plaintiff was previously advised in the October 26, 2016 Order to Answer, a plaintiff may name "John Doe" as a defendant when the identity of a defendant is unknown. Boyd v. Gullet, 64 F.R.D. 169 (D. Md. 1974). However, a district court is not required "to wait indefinitely" for the plaintiff to provide the defendant's true identity to the Court. Glaros v. Perse, 628 F.2d 679, 685 (1st Cir. 1980).

Plaintiff initiated this action on October 21, 2016. On October 26, 2016, summonses were issued for the named defendants and Plaintiff was directed to provide identifying information for the "unknown" Defendants "not listed in Complaint" within thirty days. Plaintiff did not provide the information then and has made no attempt to provide it since. Accordingly, service could not be effectuated on "all unknown [Defendants] not listed in Complaint."

Here, Plaintiff has had more than sufficient time to provide correct information in order to identify and effectuate service on these Defendants. Noting Plaintiff's lack of diligence in doing so, the undersigned recommends that the Plaintiff's claims against the "unknown [Defendants] not listed in Complaint" be dismissed for failure to timely effectuate service.

## IV. Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that the Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [ECF No.

32] be **GRANTED** as to all Defendants and that Plaintiff's complaint [ECF No. 1] be **DENIED and dismissed with prejudice** from the docket.

Further, it is recommended that Plaintiff's pending *pro se* Motion for Discovery [ECF No. 36]; Motion for Injunction to Write to Witnesses in Other Prisons [ECF No. 38]; Motion for Injunction to be Seen by Outside Specialist [ECF No. 40]; and his Motion to Postpone Summary Judgment [ECF No. 68] all be **DENIED as moot.**

**Within fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of the Court written objections identifying the portions of the Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of Court is directed to mail a copy of this Report and Recommendation to the *pro se* Plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to transmit a copy electronically to all counsel of record. This Report and Recommendation completes the referral from the district court. The Clerk is directed to terminate the magistrate judge association with this case.

DATED: August 21, 2017

/s/   James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE